UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
ESTATE OF CHARLES MEEKINS POOLE,
by TYRESE BEASELY, as Temporary Administrator,

                Plaintiff,              No. 25-CV-6817

        - against -            **COMPLAINT**

CITY OF NEW YORK;            **JURY TRIAL DEMANDED**
Detective MICHAEL SALVATORI;
Police Officer NICHOLAS VERDEROSA;
Detective MICHAEL LANDI;
Sergeant KINTE WILLIS; and
JOHN AND JANE DOES 1–10,

                Defendants.
------------------------------------------------------------------X

## PRELIMINARY STATEMENT

1. This civil-rights and wrongful-death action arises from the preventable death of Charles Meekins Poole, a 43-year-old father of four. Mr. Poole died after hanging himself inside a locked NYPD holding cell in the 88th Precinct, following officers' failure to monitor him, remove obvious ligatures, or respond to escalating signs of self-harm plainly visible on camera and in person.

2. On December 5, 2023, NYPD Warrant Squad officers tased and tackled Mr. Poole during an arrest. He was transported to the 88th Precinct in a physically compromised, emotionally distressed, and highly vulnerable condition where he was bleeding from his hand but refused medical treatment. Shortly after his arrival, Mr. Poole was locked alone in a cell.

3. Inside that cell, Mr. Poole removed his long-sleeved shirt, tore it into strips, and placed the strips beside him on the bench. Two Defendant Officers entered the holding cell room, stood within feet of Mr. Poole, spoke with him, and saw him seated next to the torn fabric. These strips were an unmistakable and widely recognized indicator of suicide preparation. Despite this clear

1

signal, neither officer removed the ligature material, initiated suicide precautions, or arranged for meaningful monitoring. They left him alone.

4. After the Defendant Officers departed, Mr. Poole fashioned the torn strips into a noose and secured it above the cell door. At approximately 1:31 p.m., he placed the noose around his neck, stepped onto the bench, and stepped off, hanging himself. No officer had been assigned to monitor him—either in person or on the CCTV feed—despite NYPD Patrol Guide directives requiring supervision of detainees and heightened vigilance when detainees exhibit signs of distress or unusual behavior.

5. For approximately twenty-two minutes, Mr. Poole remained hanging in that cell without discovery. During the early portion of this period, three separate NYPD members walked past the holding cell room while Mr. Poole's body remained suspended and in visible medical distress—but none entered, investigated, or summoned aid.

6. When NYPD officers eventually entered the holding cell room and saw Mr. Poole suspended by the neck, he was unresponsive and pulseless. Although officers attempted resuscitation and emergency medical personnel transported him to Brooklyn Hospital Center, the prolonged lack of oxygen caused irreversible brain injury. Mr. Poole never regained meaningful neurological function and was pronounced dead on December 11, 2023.

7. Mr. Poole's death was the foreseeable outcome of the NYPD's longstanding failures in its precinct holding cells: accessible ligature points, inadequate monitoring practices, failures to assign cell attendants, inconsistent and often nonexistent cell checks, and a systemic inability—or unwillingness—to recognize or respond to suicide-risk cues even when they occur in plain view. The failure to assign any officer to watch Mr. Poole, despite his visible distress and the

2

presence of torn clothing, reflects a deeply rooted pattern of indifference to detainee safety within NYPD lockups.

8. This pattern is well-documented. Forty-three (43) people died in NYPD custody in just the two years of 2023 and 2024 combined — roughly double the toll of any two-year period since at least 2016, according to police data and officials.[1]  This underscores the City's failure to enact urgently needed custodial safeguards. These are not DOC or jail deaths. These are NYPD precinct and courthouse deaths, just like Mr. Poole's. His was not an isolated tragedy. It was the result of a predictable and deadly pattern.

9. Mr. Poole is survived by four children, three of whom are minors. This action seeks accountability for the violations of Mr. Poole's constitutional rights and fair compensation for the loss of his life, his care, and his guidance in his children's lives.

<strong><u>JURISDICTION AND VENUE</u></strong>

10. This action arises under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

11. The Court has supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367, because those claims form part of the same case or controversy as the federal claims.

---

[1] The City, *Deaths in NYPD Custody Doubled in 2023–2024*, The City (Sept. 17, 2025) https://www.thecity.nyc/2025/09/17/deaths-nypd-custody-doubled-2023-2024/ (last visited December 9, 2025).

12. Venue is proper in the Eastern District of New York under 28 U.S.C. § 1391(b), because the events giving rise to these claims occurred in Kings County, within this District.

13. Plaintiff has complied with the notice requirements of New York General Municipal Law §§ 50-e and 50-i. A timely Notice of Claim was served on the City of New York regarding the wrongful death of Mr. Poole and related state-law claims. More than thirty (30) days have elapsed since service and the City has neither adjusted nor paid the claim.

14. Plaintiff further alleges that, upon information and belief, the City has suffered no prejudice from any amendments or supplemental notices necessitated by the late-issued Temporary Letters of Administration, and all conditions precedent to suit have been satisfied.

**PARTIES**

15. Plaintiff ESTATE OF CHARLES MEEKINS POOLE is the estate of decedent Charles M. Poole, who died on December 11, 2023, following a hanging in NYPD custody. The Estate appears by TYRESE BEASLEY, the decedent's eldest child, duly appointed as Temporary Administrator by the New York County Surrogate's Court. This action is brought for the benefit of Mr. Poole's four children, including three minors who are statutory distributees under New York law.

16. Defendant CITY OF NEW YORK ("City") is a municipal corporation organized under the laws of the State of New York. The New York City Police Department ("NYPD") is an agency of the City. At all relevant times, the City, through the NYPD, was responsible for policies, practices, training, supervision, discipline, and oversight of its members with respect to detainee care and holding cell operations.

4

17. Defendant Detective MICHAEL SALVATORI was, at all relevant times, an NYPD detective assigned to a Warrant Squad. He participated in the arrest of Mr. Poole on December 5, 2023, and transported him to the 88th Precinct. Detective Salvatori is sued in his individual capacity.

18. Defendant Police Officer NICHOLAS VERDEROSA was, at all relevant times, an NYPD police officer assigned to the same Warrant Squad. He deployed a conducted electrical weapon ("Taser") at Mr. Poole and participated in the physical takedown and transport to the 88th Precinct. Officer Verderosa is sued in his individual capacity.

19. Defendant Detective MICHAEL LANDI was, at all relevant times, an NYPD detective assigned to the 88th Precinct. He entered the holding cell room on December 5, 2023, stood within feet of Mr. Poole, interacted with him, and observed him seated beside torn strips of his shirt, yet he failed to remove the materials, initiate suicide precautions, or ensure monitoring. Detective Landi is sued in his individual capacity.

20. Defendant Sergeant KINTE WILLIS was, at all relevant times, the desk officer at the 88th Precinct. As desk officer, he was responsible for supervising precinct operations, including detainee monitoring, assignment of cell attendants, and ensuring that required visual checks were performed. Sergeant Willis discovered Mr. Poole hanging in his cell. He is sued in his individual capacity.

21. Defendants JOHN AND JANE DOES 1–10 are NYPD members whose identities are presently unknown. Upon information and belief, these defendants participated in the arrest, intake, monitoring, supervision, CCTV observation, or holding cell oversight of Mr. Poole at the 88th Precinct. These Doe Defendants include, without limitation, the three NYPD members who walked past the holding cell room while Mr. Poole remained visibly suspended, as well as any

5

officer responsible for cell checks, CCTV monitoring, or detainee supervision. Plaintiff will amend this Complaint to identify these individuals once their identities are ascertained.

22. At all relevant times, the individual defendants acted under color of state law and within the scope of their employment with the NYPD.

23. The City of New York is responsible for the actions of NYPD officers acting in their official capacities when executing municipal policies, customs, or practices.

## FACTUAL ALLEGATIONS

### A. Overview of Events

24. On December 5, 2023, Charles Meekins Poole was arrested by NYPD Warrant Squad officers and transported to the 88th Precinct for processing. After officers forcibly arrested and fired a Taser at him, Mr. Poole appeared subdued, slow-moving, and visibly distressed. He hardly spoke, was slow, seemed visibly on drugs, and "spaced out" and was hardly fully responsive and engaged. Immediately upon arrival at the precinct, he refused medical treatment offered by an EMT—an act that, under NYPD training and national custodial standards, is itself a suicide-risk cue requiring heightened observation.

25. At approximately 1:04 p.m., Mr. Poole was placed alone in Holding Cell No. 2 within the precinct's holding cell room. The cell contained accessible horizontal and vertical fixtures, including the upper lip of the cell door—obvious ligature points. No officer was stationed inside the room at the time Mr. Poole was placed in the cell.

26. Within minutes, Mr. Poole removed his long-sleeved shirt, tore it into strips, and placed the torn fabric beside him on the bench. His actions were visible on the precinct closed-circuit

6

television ("CCTV") system and were plainly observable to anyone entering the room. Under nationally accepted custodial standards (ACA, NCCHC) and Patrol Guide training on safeguarding prisoners, tearing clothing into long strips is a textbook suicide-warning behavior requiring immediate intervention.

27. Between approximately 1:18 p.m. and 1:24 p.m., two Defendant Officers, one upon information and belief being Defendant Landi, entered the holding cell room, stood within feet of Mr. Poole, interacted with him, and saw him seated next to the torn strips of fabric. Neither officer removed the strips, initiated suicide precautions, or arranged for monitoring. They departed the room, leaving Mr. Poole entirely unsupervised.

28. After the Defendant Officers exited, Mr. Poole tied the torn fabric into a ligature, secured it above the door, placed it around his neck, and at approximately 1:31 p.m. stepped from the bench and hanged himself. No cell attendant had been assigned, despite NYPD Patrol Guide requirements that detainees be monitored by an assigned officer or attendant and that emotionally distressed detainees be placed on heightened-watch status.

29. Mr. Poole remained hanging and in medical distress for approximately twenty-two minutes before discovery. At least three different NYPD members passed the holding cell room—each with a direct view through the door's visibility perforations—while Mr. Poole's body was visibly suspended and exhibiting movement consistent with acute anoxic distress. None of these officers entered, investigated, or summoned aid.

30. When officers eventually entered the room at approximately 1:53 p.m., Mr. Poole was unresponsive and pulseless. Although NYPD personnel initiated resuscitation and EMS transported him to Brooklyn Hospital Center, the prolonged oxygen deprivation caused

irreversible brain injury. Mr. Poole never regained meaningful neurological function and was pronounced dead on December 11, 2023.

**C. Officers' Knowledge and Missed Opportunities to Intervene**

36. By the time Mr. Poole tore his shirt into strips (approximately 1:11 p.m.), multiple NYPD members already had adequate information placing them on notice of a significant and escalating risk. Mr. Poole had: (a) been subjected to a forceful arrest involving a CEW deployment, (b) refused medical evaluation, (c) been placed alone in a locked cell, and (d) begun visibly fashioning ligature-length strips of fabric. These circumstances, taken together, constitute a textbook constellation of suicide-risk indicators recognized in NYPD training and national corrections standards.

37. At approximately 1:18 p.m., Defendant Doe #1 entered the holding cell room and remained at the computer terminal with his back partially turned to Mr. Poole. During that time, the torn fabric was already lying on the bench in clear view. Mr. Poole spoke to the officer, and the officer turned toward him several times. Despite the proximity and the visibility of torn shirt material—an unmistakable red flag—Defendant Doe #1 neither removed the ligature materials nor escalated the situation to a supervisor or medical personnel.

38. At approximately 1:21 p.m., Detective Landi entered the holding cell area and stood directly beside Cell #2 to speak with Mr. Poole. The two were within arm's reach. The shirt strips remained on the bench in plain view. Mr. Poole told Landi he believed his arrest was for "DV." The seriousness of the underlying allegations, combined with refusal of medical care and recent CEW exposure, would have placed any reasonable officer on heightened alert. Nonetheless,

8

Detective Landi did not inquire about the torn clothing, did not remove potential ligatures, and did not communicate any concern to the desk officer or any supervisor. He handed Mr. Poole a cigarette and left.

39. Neither Defendant Doe #1 nor Detective Landi took even the simplest safety measure—removing the torn shirt pieces from the cell—though doing so would have taken seconds and would have immediately eliminated the means of self-harm. Their failure to do so, despite the obviousness of the risk cues, represents a profound lapse in the basic custodial duties NYPD policies require.

40. The risk intensified after Landi and Doe # 1 exited at approximately 1:24 p.m. Because no one was assigned to monitor Mr. Poole in person and no one was actively watching the CCTV feed, Mr. Poole remained completely unobserved during the period when he tied the ligature above the cell door and prepared to hang himself.

41. At approximately 1:31 p.m, Mr. Poole hanged himself. For nearly two minutes afterward, the CCTV shows visible movement in his body. During that window, a different unidentified NYPD member (Doe Defendant) walked past the holding cell room. The officer did not enter the room, did not investigate, and did not perform any check, even though Mr. Poole's body was visibly moving inside Cell #2. This was an additional missed opportunity to intervene and save Mr. Poole's life.

42. Mr. Poole remained hanging, motionless and undiscovered, for approximately twenty-two minutes until Desk Sergeant Willis entered the holding cell room at approximately 1:53 p.m. No officer—supervisor or otherwise—performed a required check, visually inspected the cell, or viewed the monitor during this period.

9

43. These missed opportunities were not isolated errors. They occurred within a predictable sequence of known risk cues, each of which independently warranted immediate intervention. The combination of (a) visible ligature construction, (b) two direct officer encounters in close proximity to the torn clothing, (c) a walk-by during active post-hanging movement, and (d) an extended period of time with no checks or monitoring, collectively demonstrates that Mr. Poole's condition was knowable, preventable, and repeatedly disregarded through multiple layers of the chain of command.

**D. Supervisory Failures and Desk Officer Obligations**

44. At the time of Mr. Poole's detention, Defendant Sergeant Kinte Willis was the desk officer at the 88th Precinct. Under NYPD Patrol Guide procedures, the desk officer is responsible for the overall supervision of the stationhouse, including the holding cell area, and must ensure that detainees are properly monitored. This includes assigning a cell attendant or other officer to observe detainees either in person or through the CCTV system, and confirming that required visual checks are conducted and documented.

45. No cell attendant or arresting officer was assigned to monitor Mr. Poole at any time during his detention in Holding Cell No. 2. Despite Mr. Poole's visible distress, the recent use of a conducted electrical weapon, and the shirt-tearing behavior that unfolded in the holding cell room, no reassignment or monitoring directive was issued.

46. Because no officer was assigned to watch Mr. Poole in person or via the CCTV feed, the holding cell room was functionally unsupervised during the period in which Mr. Poole tore his shirt, fashioned a ligature, suspended himself, exhibited visible movements after hanging, and

remained unresponsive. No NYPD member, including supervisors on duty, performed or confirmed the performance of any required cell checks during this interval.

47. The duty to assign and ensure monitoring was non-discretionary under the circumstances. Mr. Poole was a newly arrested detainee, placed alone in a holding cell, immediately following a forceful takedown and a Taser discharge. NYPD policies and accepted custodial standards require heightened vigilance for detainees in the early period after arrest, particularly when they have refused medical evaluation or appear in emotional or physical distress.

48. The absence of any assigned monitoring officer—despite clear indications that Mr. Poole required supervision—reflects systemic failures in NYPD lockup operations. At minimum, Sergeant Willis was responsible for ensuring that monitoring was assigned and that periodic checks were conducted. No such measures were taken.

49. This failure was not merely a lapse in administrative paperwork; it was a critical breakdown in a core custodial function. The purpose of having a desk officer oversee detainee monitoring is to prevent precisely the type of tragedy that occurred here. By failing to assign an attendant, require checks, or designate an officer to observe the CCTV feed, the NYPD left Mr. Poole without any meaningful protection during a time of obvious vulnerability.

50. As a result of these supervisory failures, no officer performed or confirmed the performance of any required cell checks during Mr. Poole's detention. This lack of monitoring directly enabled Mr. Poole to tie a ligature, hang himself, remain visibly in distress, and ultimately die without timely intervention.

**E. Prior Suicide Warnings and NYPD's Failure to Record or Transmit Risk Information**

51. Prior to the events of December 5, 2023, a close family member of Mr. Poole communicated concerns to NYPD personnel that Mr. Poole was suicidal and in danger of harming himself. Upon information and belief, these warnings were conveyed during the period in which NYPD members were attempting to locate Mr. Poole on the underlying I-Card.

52. Upon information and belief, NYPD officers who received these warnings did not document them in any of the NYPD risk-assessment fields that are routinely used to guide officer response and custodial handling. For example, NYPD's standardized "EDP/Suicide History" field—which appears in operational records reviewed by arresting officers, warrant squads, and desk officers—reflected "No" for suicide history, despite the family member's prior statements to NYPD that Mr. Poole was suicidal.

53. This failure to record, escalate, or transmit suicide-risk information reflects systemic deficiencies in the NYPD's internal communication practices regarding at-risk individuals. These deficiencies directly contributed to officers' lack of awareness at the precinct and their failure to assign supervision or remove ligatures during Mr. Poole's custodial period.

54. Had the prior warnings been documented and transmitted, Mr. Poole would have been entitled to:

   (a) immediate suicide-risk screening;

   (b) removal of all potential ligature materials;

   (c) classification as an at-risk detainee; and

   (d) continuous or near-continuous observation.

12

55. The NYPD's failure to record and route these warnings was a moving force behind the constitutional violations at issue and part of a broader pattern of breakdowns in detainee-risk documentation.

**F. Longstanding Pattern of NYPD Failures: Prior Suicides, SCOC Findings, Bronx Defenders, Legal Aid, and 2025 Deaths**

56. Mr. Poole's death did not occur in isolation. For more than a decade, the City of New York and the NYPD have been on explicit notice that detainees in NYPD precinct holding cells face a significant and recurring risk of suicide, especially by hanging with clothing or bedding. Despite multiple preventable deaths, public scrutiny, internal reviews, and findings from the New York State Commission of Correction ("SCOC"), the City has failed to implement or enforce adequate suicide-prevention practices in precinct lockups. This persistent pattern forms a critical part of the causal chain leading to Mr. Poole's death.

57. NYPD precinct suicides by hanging have occurred repeatedly under similar circumstances—individuals placed alone in cells, left with clothing capable of being fashioned into ligatures, and insufficiently monitored. Publicly reported incidents include multiple suicides across precincts in 2015–2016, such as:

> a. 2015 – 121st Precinct (Staten Island): A man in his fifties was found with a ligature fashioned from clothing and later died; news reporting identified the death as a suicide in the precinct's holding cell.[2]

---

[2] *See* Al Baker and Nate Schweber, Brooklyn Suicide Is Third Hanging in City Holding Cells Since May (N.Y. Times February 1, 2016) https://www.nytimes.com/2016/02/02/nyregion/brooklyn-suicide-is-third-hanging-in-city-holding-cells-since-may.html (last visited Dec. 10, 2025).

b. 2015 – 49th Precinct (Bronx) – Samuel Reyes: Mr. Reyes died by suicide after hanging himself in the 49th Precinct holding cell; media outlets reported that a supervising sergeant was placed on modified duty following the incident.[3]

c. 2016 – 69th Precinct (Brooklyn) – Serge Duthely: Mr. Duthely, 28, died by suicide after hanging himself with clothing inside a precinct holding cell.

58. Years later, the pattern persisted. In February 2023, Felipe Mendez died in the 47th Precinct holding cell in the Bronx. The New York State Commission of Correction issued a formal investigative report finding that there was a "failure by NYPD Officers and Supervisors to complete and document watch tours of the holding cell area in accordance with minimum standards," citing gaps as long as eighty-seven minutes between checks—even though state law requires checks at least every thirty minutes. The SCOC expressly cited noncompliance with 9 NYCRR § 7504.1, which mandates visual inspections of detainees at least twice per hour and proper documentation. Despite this official condemnation and directive for corrective action, NYPD did not implement effective changes department-wide.[4]

59. In July 2025, Saniyah Cheatham, an 18-year-old detainee, died by hanging in the 41st Precinct in the Bronx using her sweater. As in earlier cases, she was unmonitored for extended periods and left with ligature material. The incident prompted community demands for

---

[3] Ben Fractenberg & Trevor Kapp, *NYPD Investigates Prisoner Suicide in Bronx Precinct, Bratton Says*, DNAinfo (Nov. 17, 2015) https://www.dnainfo.com/new-york/20151117/morris-park/nypd-investigates-prisoner-suicide-bronx-precinct-bratton-says/ (last visited Dec. 10, 2025).

[4] N.Y. State Commission of Correction, *Final Report: In the Matter of the Death of Felipe Mendez*, at 2–4 (Dec. 18, 2024) https://scoc.ny.gov/system/files/documents/2025/02/mendez-felipe-nypd-47th-pct.pdf (last visited Dec. 10, 2025).

transparency and highlighted the continued absence of suicide-resistant cells, inadequate monitoring, and poor adherence to established safety protocols.[5]

60. In August 2025, Christopher Nieves, held in NYPD's courthouse cells at Kings County Criminal Court, died after repeatedly requesting medical care that officers failed to provide. Although not technically a suicide, the Nieves case exposed systemic deficiencies in NYPD custodial care — including failure to conduct required supervision, failure to summon timely medical treatment, and failure to adhere to basic detainee-safety protocols. Legal Aid publicly identified Mr. Nieves's death as "one of at least five" NYPD custody deaths in 2025 alone, underscoring the breadth of custodial neglect.[6] [7]

61. Earlier in 2025, Musa Çetin, a pedicab driver, hanged himself inside a precinct holding cell, again using clothing as a ligature while unmonitored. His death received public attention, further highlighting the NYPD's persistent failure to implement basic suicide-prevention measures.[8]

62. Public defender organizations—including The Bronx Defenders, Legal Aid Society, and others—have publicly raised alarm about dangerous and sometimes fatal conditions in NYPD custody, including preventable deaths in precinct holding cells, court detention facilities, and other NYPD-controlled environments. In 2025, The Bronx Defenders joined other defender organizations in issuing public statements following multiple NYPD-custody deaths, calling for

---

[5] Christina Carrega, *Saniyah Cheatham's Family Demands Answers in Her Death*, Capital B News (July 16, 2025) https://capitalbnews.org/saniyah-cheatham-death-police-custody/ (last visited Dec. 10, 2025).

[6] Charles Lane & Brittany Kriegstein, *Man Who Died in NYPD Custody Asked to Go to Hospital Hours Before, Officials and Family Say*, Gothamist (Sept. 4, 2025) https://gothamist.com/news/man-who-died-in-nypd-custody-asked-to-go-to-hospital-hours-before-officials-and-family-say (last visited Dec. 10, 2025).

[7] Jacob Kaye, *Legal Aid Calls on DOI to Investigate NYPD In-Custody Deaths*, Queens Daily Eagle (Sept. 16, 2025) https://queenseagle.com/all/2025/9/16/legal-aid-calls-on-doi-to-investigate-nypd-in-custody-deathsby (last visited Dec. 10, 2025).

[8] Maia Coleman and Benjamin Weiser, *Detainee Dies at Rikers, the Fifth Fatality in 2 Weeks in N.Y.C. Lockups* https://www.nytimes.com/2025/09/04/nyregion/rikers-detainee-death.html (last visited Dec. 10, 2025).

system-wide reforms, improved custodial safety practices, and greater oversight of NYPD detention operations.[9] These public defender groups, alongside community advocates, issued a joint statement sounding the alarm over a *"growing crisis"* of deaths in NYPD custody.[10] The release notes that "at least nine people have lost their lives in NYPD custody this year alone" (2025) and declares that *"each death is a preventable tragedy." "These deaths are not accidents – they are the direct result of systemic neglect… The City must act now… No more lives should be lost,"* the joint statement urged.

63. Collectively, these incidents establish a well-documented pattern of NYPD's failure to monitor detainees at appropriate intervals; assign officers responsible for visual checks; remove obvious ligature materials; design or retrofit precinct cells to reduce ligature points; provide suicide-prevention training aligned with national correctional standards; transmit risk information between units; and ensure meaningful supervisory oversight.

64. Despite this long and tragic pattern, the City and NYPD failed to adopt meaningful reforms, leaving detainees like Mr. Poole vulnerable to preventable self-harm and death.

**G. Applicable Standards and NYPD's Failure to Meet Custodial Obligations**

65. National standards have long made these requirements explicit. The American Correctional Association (ACA), the National Commission on Correctional Health Care (NCCHC), and the Commission on Accreditation for Law Enforcement Agencies (CALEA) all recommend:

  • enhanced screening for mental-health and suicide risk;

---

[9] https://legalaidnyc.org/news/investigation-nypd-custody-deaths/#:~:text=,New%20Yorkers%20through%20the%20system (last visited December 9, 2025)
[10] *NYC Public Defenders, Community Groups Unveil Ten-Point Plan to Address Growing Crisis of Deaths in NYPD Custody* https://www.bronxdefenders.org/nyc-public-defenders-community-groups-unveil-ten-point-plan-to-address-growing-crisis-of-deaths-in-nypd-custody/#:~:text=,NYPD%29%20custody

- observation at least every 15 minutes for at-risk detainees;

- continuous direct observation where any self-harm risk exists;

- removal of all potential ligature materials;

- suicide-resistant housing or fixtures; and

- staff training on recognizing and responding to suicide cues.

These standards were well known to correctional and police agencies nationwide during the relevant time period.

66. New York State law mirrors these standards. 9 NYCRR § 7504.1 imposes ministerial requirements (not discretionary) for precinct holding cells: visual checks at least every 30 minutes, proper documentation of each check, reporting of unusual behavior, and immediate action when detainees exhibit self-harm risks. These obligations are mandatory. NYPD has consistently failed to comply with them across multiple commands over many years.

67. Despite this body of knowledge, the NYPD did not implement adequate policies, meaningful training, or command-level enforcement to prevent further deaths. Officers were not consistently trained to recognize self-harm cues, such as tearing clothing into strips. Many precincts lacked any formal practice of assigning a cell attendant. Supervisors routinely failed to enforce required tours. NYPD did not install suicide-resistant fixtures or modify holding cell designs that contain easy ligature points. And although NYPD maintains systems for identifying individuals with suicide histories, it failed to record or act on family-reported warnings about Mr. Poole's suicidal ideation.

68. This longstanding pattern of detainee suicides—and NYPD's repeated inaction in the face of clear warnings—demonstrates a municipal policy, practice, or custom of inadequate supervision, inadequate monitoring, inadequate training, and inadequate implementation of suicide-prevention protocols. These failures were a foreseeable and proximate cause of Mr. Poole's death. Had the NYPD implemented and enforced basic, widely accepted custodial-care standards (including suicide-risk screening, removal of ligatures, assignment of a cell attendant, and timely visual checks), Mr. Poole would not have been able to take his life in NYPD custody.

69. NYPD officers responsible for detainees in precinct holding cells are expected to comply with recognized custodial-care principles derived from the Fourteenth Amendment, national correctional standards, and widely accepted law-enforcement practices. These principles exist to protect individuals who, once in custody, cannot protect themselves.

70. Core custodial duties include: (a) removing or securing obvious ligature materials; (b) initiating closer monitoring when a detainee exhibits signs of distress or self-harm; (c) conducting regular visual observations; (d) supervising the cell area to ensure detainee safety; and (e) summoning medical or mental-health support when risk is apparent. These duties are reflected across the national standards governing short-term detention facilities.

71. The American Correctional Association (ACA) recommends that detainees be observed "at least every 30 minutes," and that individuals demonstrating self-harm cues or unusual behavior receive "more frequent and documented supervision," including continuous observation when warranted. The National Commission on Correctional Health Care (NCCHC) likewise mandates heightened and, where appropriate, constant observation for any detainee showing indicators of suicidal behavior—including agitation, visible distress, and manipulation of clothing or bedding

into ligature-like strips. These standards have long been applied to municipal lockups and short-stay holding cells.

72. The Commission on Accreditation for Law Enforcement Agencies (CALEA) recommend specific policies for custodial safety, including: (a) direct supervision by trained staff; (b) visual checks at established intervals; (c) procedures for identifying detainees at risk of self-harm; and (d) removal of items capable of being used as ligatures. DOJ and NIC guidance similarly emphasizes that detainees must be continuously observed when they exhibit behavior suggesting potential self-harm, such as tearing clothing or pacing anxiously.

73. Although these national standards permit 30-minute intervals as a general ceiling for routine, low-risk detainees, they also make clear that any signs of distress, agitation, or self-harm necessitate immediate escalation—and often continuous direct observation. Mr. Poole was not a low-risk detainee. At the time he was placed in the cell, he had (a) been tased, (b) refused medical treatment, (c) appeared emotionally overwhelmed, and catatonic, or high, and (d) soon began tearing his shirt into strips. The 30-minute interval was never intended to serve as a shield for inaction when risk cues are evident.

76. These incidents—spanning multiple years, boroughs, and supervisory structures—established that detainee suicides by hanging with clothing are a predictable and recurring outcome when NYPD personnel fail to remove ligatures or conduct appropriate monitoring, and they must be prevented. The City has been on repeated notice that detainees placed alone in precinct cells, left with clothing capable of being fashioned into ligatures, and insufficiently monitored, face substantial risk of harm.

19

77. National standards also emphasize that suicide-resistant design is an essential component of custodial safety. Fixtures such as door frames, vent grates, and protruding bars are recognized ligature points and should be eliminated or mitigated whenever feasible. NYPD's precinct cells—including the one in which Mr. Poole was housed—retain readily accessible ligature points, despite years of suicides involving clothing tied to cell fixtures.

78. NYPD did not adopt adequate policies, training, or supervision to address these deficiencies. Officers were not reliably trained in identifying suicide cues such as tearing clothing, pacing, or visible agitation. Supervisors did not ensure that detainees were observed at appropriate intervals, and NYPD failed to adopt or enforce policies requiring continuous observation of detainees exhibiting warning signs. Moreover, NYPD did not implement any mechanism ensuring that suicide-risk information received from family members or victims—such as the warning that Mr. Poole was suicidal and was entered into risk-assessment fields or communicated to officers responsible for detainee care.

79. As reflected in the events of December 5, 2023, these systemic failures—insufficient monitoring, inadequate response to known suicide cues, retention of ligature-prone fixtures, inconsistent supervision, and failure to record or transmit risk information—created the environment in which Mr. Poole was able to tie a ligature, hang himself, remain visibly in medical distress, and ultimately die without intervention. These failures were a direct and proximate cause of the constitutional violations suffered by Mr. Poole.

### CAUSES OF ACTION

**COUNT I**
**42 U.S.C. § 1983 – Deliberate Indifference to a Substantial Risk of Suicide**
**(Fourteenth Amendment – Against the Individual Defendants)**

20

80. Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein.

81. At all relevant times, Mr. Poole was a pretrial detainee in NYPD custody. He had not been convicted of any offense and was entitled under the Fourteenth Amendment's Due Process Clause to be kept in safe custody and not to be punished or subjected to deliberate indifference to his basic needs. This constitutional protection includes the right to reasonable measures to guarantee his safety and life while detained, and the right to necessary medical care for serious conditions, including mental health crises. Defendants were obligated to provide such care and protection and to intervene to prevent Mr. Poole from suffering harm, especially when faced with a known or obvious risk of serious harm such as suicide.

82. The Individual Defendants named in this Count—Detective Salvatori, Officer Verderosa, Detective Landi, Sergeant Willis, and John/Jane Does 1–10—while acting under color of state law, violated Mr. Poole's constitutional rights by acting (and failing to act) with deliberate indifference to a substantial risk of serious harm to Mr. Poole. Specifically, Defendants were deliberately indifferent to Mr. Poole's risk of suicide and to his serious medical needs in the following non-exhaustive ways:Failure to Monitor or Supervise: Each Individual Defendant knew or should have known that Mr. Poole faced a substantial risk of suicide based on his visible distress, refusal of medical care, recent CEW deployment, isolation, and the presence of torn ligature material. Despite this:

> (i)    Detective Salvatori and Officer Verderosa placed Mr. Poole in the holding cell room and left him without ensuring that an observing officer or cell attendant was assigned;

> (ii)    Detective Landi and Defendant Doe # 1 observed Mr. Poole seated beside torn shirt strips—obvious suicide-warning signs—yet left him unmonitored;

21

(iii)    Sergeant Willis, as desk officer, failed to assign any officer to monitor Mr. Poole either directly or through the CCTV feed, contrary to Patrol Guide requirements;

(iv)    Doe Defendants 2–4 walked past the cell while Mr. Poole was visibly suspended, yet took no action;

Together, these failures left Mr. Poole completely unobserved during the period in which he prepared and carried out his suicide, constituting deliberate indifference under the Fourteenth Amendment.

b.  Failure to Remove Ligature Material: Detective Landi and Doe Defendants who interacted with or passed Mr. Poole saw or should have seen the torn shirt strips lying beside him—clear and recognized ligatures used in prior NYPD suicides. They failed to remove the strips, secure Mr. Poole's clothing, or notify supervisory personnel. This omission directly enabled Mr. Poole to construct the noose used in his death.

c. Failure to Recognize and Respond to Suicidal Behavior: Mr. Poole's behavior of destroying his clothing was an unequivocal plea for help and a sign of suicidal intent. Defendants Landi and Doe # 1 directly observed this behavior (or its immediate aftermath) and blatantly failed to respond appropriately. They did not initiate any suicide watch, did not summon medical or psychological assistance, and did not even report up the chain of command that Mr. Poole was behaving in a way that suggested self-harm. Their response – effectively doing nothing and leaving – was so inadequate that it reflected deliberate indifference to Mr. Poole's life. Further, Sergeant Willis, informed that Mr. Poole had refused medical care after a taser exposure, knew Mr. Poole was at some risk and needed closer observation, yet he treated Mr. Poole like a

routine arrestee. All Defendants were or should have been aware (especially by 1:18–1:24 p.m.) that Mr. Poole posed a danger to himself, yet they consciously disregarded that danger. This satisfies even the strictest standard of deliberate indifference.

d. Failure to Timely Rescue: After Mr. Poole hanged himself at 1:31 p.m., Defendants compounded the violation by failing to discover or respond to his medical emergency for 22 more minutes. By depriving Mr. Poole of prompt aid, they allowed his condition to worsen from potentially salvageable (if cut down quickly, he might have been revived without brain damage) to irretrievable (after 22 minutes of anoxia). In effect, their failure to act turned a survivable attempt into a fatal outcome. This delay was a direct product of their earlier indifference (no monitoring) and constitutes an additional violation of Mr. Poole's right to adequate emergency medical care. After Mr. Poole suspended himself at approximately 1:31 p.m., Doe Defendants 2–4 passed the cell while Mr. Poole remained visibly suspended and in medical distress, yet none intervened.

83. The Individual Defendants' foregoing actions and omissions were performed knowingly, recklessly, and with callous disregard for Mr. Poole's life and rights. No reasonable officer in 2023 could believe that it was constitutionally permissible to ignore a detainee who is in the process of making a noose, or to leave an at-risk prisoner unobserved for long stretches in a cell containing hanging materials. The Defendants had fair warning from departmental policy, training, and common humanity that their conduct was unlawful. Their behavior "shocks the conscience" in that they had custody of a human being and essentially stood by (or walked away) as he orchestrated his own death.

84. The Individual Defendants' foregoing actions and omissions were objectively unreasonable and constituted deliberate indifference to a substantial risk of suicide. No reasonable officer could conclude that it was appropriate to ignore visible suicide cues, leave an at-risk detainee unmonitored, or fail to intervene when a detainee is visibly suspended.

85. As a direct and proximate result of the Individual Defendants' deliberate indifference, Mr. Poole suffered extreme pain and suffering and died, and his Estate and next-of-kin have suffered devastating injuries, including the loss of Mr. Poole's life, companionship, and economic support. Had the Defendants fulfilled their basic constitutional obligations, Mr. Poole's suicide would have been prevented or at least timely halted before fatal damage occurred. Their violations of his rights were a substantial factor in causing his death and the associated damages.

86. Accordingly, each Individual Defendant is liable under 42 U.S.C. § 1983 for violating Mr. Poole's rights under the Fourteenth Amendment. Plaintiff seeks compensatory damages, punitive damages against the Individual Defendants, and attorney's fees and costs pursuant to 42 U.S.C. § 1988.

## COUNT II
**42 U.S.C. § 1983 – Municipal Liability (*Monell*)**
**(Against Defendant City of New York)**

87. Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein.

88. The constitutional violations Mr. Poole suffered were the direct result of municipal policies, customs, and practices—including failures in training, supervision, monitoring, risk communication, and detainee-safeguarding—that were attributable to the City of New York and its final policymakers.

89. For more than a decade, the City has been on notice of repeated suicides and serious custodial failures in NYPD precinct holding cells—including suicides by hanging using clothing

24

in the 121st, 49th, 69th, and 41st Precincts; the SCOC-documented monitoring failures in the death of Felipe Mendez at the 47th Precinct; and at least four NYPD in-custody deaths in 2025, including those of Saniyah Cheatham, Christopher Nieves, and Musa Çetin. These incidents put the City on explicit notice that detainees were routinely left unmonitored, that ligature materials were not removed, that holding cells retained known ligature points, and that mandated observation practices were not enforced.

90. National correctional standards from the American Correctional Association (ACA), National Commission on Correctional Health Care (NCCHC), and the Commission on Accreditation for Law Enforcement Agencies (CALEA) have long recommended: (a) removal of ligature materials; (b) suicide-resistant design or mitigation of ligature points; (c) enhanced monitoring for individuals in distress; and (d) continuous observation when detainees exhibit self-harm cues. The City failed to adopt, implement, or enforce practices consistent with these standards, despite repeated incidents demonstrating the need for such measures.

91. Despite these known risks, the City failed to:

(a) retrofit or mitigate ligature-prone fixtures in precinct cells, despite decades of suicides using identical anchor points;

(b) train officers adequately on recognizing and responding to suicide cues such as tearing clothing, pacing, refusing medical care, or visible agitation;

(c) require or enforce assignment of cell attendants or designated monitoring officers;

(d) enforce Patrol Guide–mandated observation practices, including required visual inspections;

(e) implement reliable mechanisms for recording and transmitting suicide-risk information;

25

(f) ensure adequate supervision by desk officers and supervisors over detainee monitoring; and

(g) ensure direct observation when detainees exhibited obvious risk behavior on CCTV.

These systemic deficiencies demonstrate deliberate indifference to the constitutional rights of detainees like Mr. Poole.

92. These systemic deficiencies were so widespread, persistent, and longstanding as to constitute a municipal custom. The City's failure to implement or enforce basic custodial practices—despite repeated deaths, publicly reported incidents, Commission of Correction findings, and warnings from defender organizations such as the Legal Aid Society and Bronx Defenders—demonstrates deliberate  indifference to detainee safety. The need for adequate training, supervision, ligature mitigation, and monitoring was obvious, and the City's failure to act on this need was the moving force behind the violation of Mr. Poole's constitutional rights.

93. As a direct and proximate result of these municipal failures, Mr. Poole was able to fashion a ligature, hang himself in a cell containing accessible anchor points, remain in visible medical distress without intervention, and ultimately die.

94. Plaintiff seeks compensatory damages, declaratory relief, injunctive relief requiring the City to implement adequate suicide-prevention practices, and attorneys' fees and costs under 42 U.S.C. § 1988.

**COUNT III**
**\*\*Wrongful Death (EPTL § 5-4.1)\*\***
**\*\*(Against the City of New York and the Individual Defendants)\*\***

95. Plaintiff repeats and realleges all preceding paragraphs.

26

96. Defendants owed Mr. Poole a duty to exercise reasonable care for his safety while he was in custody, including a duty to protect him from reasonably foreseeable self-harm and to take reasonable measures to prevent suicide once he exhibited suicide-risk indicators.

97. Defendants breached this duty by: (a) failing to monitor Mr. Poole; (b) failing to assign a cell attendant or responsible officer; (c) failing to conduct required visual inspections; (d) failing to remove torn clothing and other obvious ligature materials; (e) failing to respond to visible suicide-warning signs; (f) failing to intervene when Mr. Poole was visibly suspended in the cell; and (g) failing to comply with NYPD custodial-care obligations.

98. As a direct and proximate result of Defendants' negligence and gross negligence, Mr. Poole died.

99. Mr. Poole's statutory distributees—his four children, including three minors—have suffered pecuniary losses, including loss of parental guidance, support, nurture, and economic contributions.

100. The City of New York is vicariously liable for all negligence committed by its employees acting within the scope of employment.

101. Plaintiff seeks all damages recoverable under EPTL § 5-4.3, together with interest from the date of death.

### COUNT IV
**Survival Action – Conscious Pain and Suffering (EPTL § 11-3.2(b))**
**(Against All Defendants)**

102. Plaintiff repeats and realleges all preceding paragraphs.

103. Before his death, Mr. Poole experienced conscious pain and suffering during the period in which he suspended himself and exhibited visible physical movements consistent with acute medical distress after hanging.

104. Defendants' failures—including the failure to remove ligatures, failure to monitor, failure to intervene, and failure to respond when Mr. Poole's body was visibly moving—directly caused Mr. Poole's conscious pain and suffering.

105. Plaintiff seeks damages for Mr. Poole's physical and emotional pain before death, together with all allowable interest and costs.

## COUNT V
### **Negligent Infliction of Emotional Distress (Survival)**
### **(Against All Defendants)**

106. Plaintiff repeats and realleges all preceding paragraphs.

107. Defendants' conduct created an unreasonable and foreseeable risk of severe emotional harm to Mr. Poole by failing to respond to obvious suicide-warning signs, leaving him alone with ligature materials, and failing to intervene even as he hung visibly suspended in his cell.

108. As a direct and proximate result of Defendants' negligence, Mr. Poole suffered severe emotional distress before his death.

109. These emotional injuries are distinct, or alternatively pled, to the extent they do not duplicate the conscious pain and suffering damages sought under the Survival Action.

110. Plaintiff seeks damages for negligent infliction of emotional distress, to the extent not duplicative of the survival claim.

## COUNT VI
### **Negligent Custodial Care, Supervision, and Training (State Law)**
### **(Against All Defendants)**

111. Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein.

28

112. Defendants owed Mr. Poole a duty to exercise reasonable care for his safety while in NYPD custody, including a duty to provide safe custodial conditions; to monitor and supervise detainees with reasonable care; to remove or secure obvious hazards; and to ensure that officers and supervisors were adequately trained in detainee safety, suicide-prevention practices, and required observation protocols.

113. The Individual Defendants and other NYPD personnel breached this duty by failing to provide reasonable custodial care; failing to conduct timely and reasonable visual checks; failing to assign or perform adequate monitoring; failing to remove or secure ligature-type materials; and failing to respond appropriately to the risk cues and behavioral indicators previously alleged.

114.  The City of New York also breached its duty by failing to reasonably train, supervise, and oversee its officers and supervisors with respect to detainee safety, suicide-prevention measures, and the custodial-care obligations governing precinct holding cells.

115. These acts and omissions—individually and collectively—constituted negligent custodial care, negligent supervision, and negligent training, and were a direct and proximate cause of Mr. Poole's injuries and death. Had Defendants exercised reasonable care in any of these respects, Mr. Poole would not have been left with ligature materials, unreasonably unmonitored, or undiscovered for an extended period after he hanged himself.

116.  As a result of Defendants' negligence, Mr. Poole suffered conscious pain and suffering, catastrophic anoxic brain injury, and ultimately death, and his statutory distributees have sustained pecuniary and related losses recognized under New York law.

117. The City of New York is vicariously liable for the negligent acts and omissions of its employees committed within the scope of their employment, and is directly liable for its own negligent training and supervision as alleged herein.

## **DAMAGES**

118. As a direct and proximate result of the acts and omissions of all Defendants, Charles Meekins Poole experienced conscious physical pain and acute medical distress during the interval in which he suspended himself and exhibited visible post-hanging movements. He suffered profound anoxic brain injury, remained unresponsive for several days, and ultimately died on December 11, 2023. His Estate is entitled to recover the full measure of damages for his conscious pain and suffering prior to death.

119. Mr. Poole's death has caused significant pecuniary losses to his statutory distributees, including his four children, three of whom are minors. These losses include but are not limited to: loss of parental nurture, guidance, advice, emotional support, care, companionship, household services, and financial contributions Mr. Poole would have provided over his expected lifetime.

120. Plaintiff further seeks punitive damages against the Individual Defendants on the federal claims. Defendants' conduct was recklessly indifferent to Mr. Poole's constitutional rights. Punitive damages are necessary to punish this misconduct and deter similar violations in the future.

121. Plaintiff also seeks attorneys' fees and litigation costs pursuant to 42 U.S.C. § 1988, as well as all other statutory and equitable entitlements, including prejudgment and post-judgment interest.

122. As a direct and proximate result of the acts and omissions of all Defendants, Charles Meekins Poole experienced conscious physical pain and acute medical distress during the interval in which he suspended himself and exhibited visible post-hanging movements. He suffered profound anoxic brain injury, remained unresponsive for several days, and ultimately died on December 11, 2023. His Estate is entitled to recover the full measure of damages for his conscious pain and suffering prior to death.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, as Temporary Administrator of the Estate of Charles Meekins Poole, respectfully requests that this Court enter judgment in Plaintiff's favor and against Defendants as follows:

a. Awarding compensatory damages in an amount to be determined at trial, including damages for:  Mr. Poole's conscious pain and suffering; the wrongful death of Mr. Poole;  loss of parental nurture, guidance, and support to his minor children;  economic losses suffered by his distributees; and  any other pecuniary and non-pecuniary losses recognized by law.

b. Awarding punitive damages against the Individual Defendants on the 42 U.S.C. § 1983 claims, in an amount sufficient to punish and deter constitutional violations involving detainee safety and suicide prevention.

c. Declaring that the conduct of the Defendants violated Mr. Poole's rights under the Fourteenth Amendment.

d. Issuing injunctive relief, as permitted, requiring the City of New York to adopt and enforce constitutionally adequate suicide-prevention practices in NYPD precinct holding cells, including:  Reliable monitoring procedures; Removal of ligature

materials; Improved training on suicide-risk identification; Mechanisms to record and transmit suicide-risk information; Adequate supervision of officers responsible for detainee care;

Implementation of suicide-resistant infrastructure.

e.   Awarding attorneys' fees, expert fees, and litigation costs pursuant to 42 U.S.C. § 1988 and any other applicable provision.

f.   Awarding prejudgment and post-judgment interest as allowed by law.

g.   Granting such other and further relief as this Court deems just and proper.

Respectfully Submitted-

_____/s/____P. Jenny Marashi___
P. Jenny Marashi
Marashi Legal
Law Office of Poupa Jenny Marashi
930 Grand Concourse
Bronx, NY 10451
Marashi.legal@gmail.com
917-703-1742

*/s/ Yan Fu*
Yan Fu
THE FU FIRM PLLC

43 W. 43rd Street, Suite 205
New York, NY 10036
(212) 584-0581
yfu@thefufirm.com

*Attorneys for Plaintiff*

32